HOUSING AUTHORITY OF THE CITY OF EAST ORANGE, PLAINTIFFS, v. MANCEL L. WARRICK AND LEE WARRICK, DEFENDANTS-APPELLANTS, v. WALTER L. CLEARY, *ET AL.*, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued February 19, 1968—Decided April 4, 1968.

Before Judges CONFORD, COLLESTER and LABRECQUE.

*Mr. Lawrence S. Schwartz* argued the cause for appellants (*Messrs. Rubin, Dolgoff & Sussman,* attorneys).

*Mr. Anthony J. Belfiore* argued the cause for respondents.

The opinion of the court was delivered by

CONFORD, S. J. A. D. The Warricks and the Cleary relatives are contestants over a fund of $12,000 deposited in court by the Housing Authority of the City of East Orange in satisfaction of a written agreement between itself as optionee-purchaser and the Warricks and Cleary, together, as "seller," for acquisition of a residence property in East Orange. The deposit was made in the course of condemnation proceedings necessitated by the unavailability of a long-missing sister of Cleary who had a one-eighth interest in the title. Cleary claims that the Warricks forfeited their interest in the property by default under an earlier installment-contract sale of the property entered into with them by Cleary (purportedly "single," but actually for himself and his relatives who shared title with him), as seller. Following a hearing on counter-motions to withdraw the fund on deposit, the Law Division agreed with that contention and ordered distribution of the moneys free from any participation by the Warricks. We conclude this was error.

On December 22, 1960 Cleary entered into the installment-contract sale agreement with the Warricks which, although inartistically and ambiguously drawn (on a standard real estate contract form with typed-in addenda), was in substance to the following effect. The sale price was fixed at $11,000, payable $100 per month beginning in December

1960 until "payment of $3,000 upon said indebtedness," whereupon the purchasers had the option of then paying the principal balance "and obtaining a deed" or continuing the $100 monthly payments until $4,200 was paid and then paying the balance (put in terms of—"it will then become the duty of the purchasers to obtain a mortgage of $6,800 for the unpaid balance"). The first reference in the instrument to the $100 payments describes them as "for the use and occupation" of the premises, the agreement specifying that the premises were to be occupied by the purchasers as a dwelling. The purchasers were also to pay taxes and water charges and obtain liability and fire insurance in favor of the sellers.

It is obvious that the real intention of the agreement was that the purchasers' payments represented not merely the value of use and occupation but partly compensation for the fee, the balance of the $11,000 price for the latter to be paid when $3,000 or $4,200 (at the purchasers' option) had been paid in the form of the $100 monthly installments.

The agreement recited that the purchasers' failure to pay any of the monthly installments of $100 or the other periodic charges should be considered a default of the contract, that thereupon all payments theretofore made would be regarded as for use and occupation, the contract be considered terminated and the purchasers would vacate on 30 days notice.

It is thus seen that by May 1964 (or within a reasonable time thereafter) the absolute obligation of purchasers to have met a $6,800 purchase-price balance ($11,000 less $4,200 in monthly payments) would have matured in the normal course.

It is clear from the record that from time to time the Warricks would fall behind in their payments and would more or less catch up after grants of extensions by Cleary, who apparently found this course more advantageous than declaring a default at any time prior to May 1964.

In 1963 or early 1964 the Housing Authority of East Orange (a public agency with power of condemnation) be-

came interested in the property and offered Mr. Warrick $10,200 for it. He refused and demanded $12,000, to which the Housing Authority ultimately acceded. On April 27, 1964 the Warricks and Cleary signed, as "seller," in the presence of the same witness, a mimeographed "Offer For Sale of Land," prepared by the Housing Authority, giving it a 90-day irrevocable option (and thereafter until terminated by sellers) to purchase the property for $12,000. This was formally accepted by the Authority May 4, 1964. Under the offer, closing was to take place not more than 60 days after acceptance, the sellers to give a general warranty deed conveying a "good and marketable fee simple title." The Authority reserved the right, after acceptance, in lieu of completing the purchase, to acquire the property by condemnation, in which event it was agreed that the $12,000 price would be taken to be the fair market value of and just compensation for the property.

Ultimately such condemnation was instituted, apparently because of the outstanding title interest of Cleary's sister. An award of $12,000 was entered in the condemnation and the money paid into court. This proceeding arises from the respective claims thereto of the present contestants.

On May 29, 1964, notwithstanding the pending sale to the Housing Authority for $12,000, Cleary's attorney wrote the Warricks informing them that the installment contract was terminated for their failure "to make payments according to the terms in the contract." They were told to vacate in 30 days. It appears that at the time the Warricks were in default of several months' payments under the agreement as well as for part of the 1964 real estate taxes. Warrick responded by letter of June 3, 1964. He said, in purport, that he had explained to Mr. Belfiore, Cleary's attorney, and to Cleary, that he had had the money for the arrears but needed time pending settlement with the Housing Authority as he was required to make a substantial down payment on other residence property he was purchasing to replace that being taken by the Authority. He further said in the letter

that: "Mr. Cleary told me he would wait until the settlement was made to get the full balance due on the property. Had you notified me of your intentions I would have taken care of the arrears instead of the down payment on the new home." There was no response to this communication.

Early in July 1964 the Warricks paid and Cleary accepted $600 for six monthly installments past due on the sale contract, and at the end of the month they paid him $100 more for the period from "7-25-64 to 8/25/64." This completed payment of the $4,200 which under the contract was to be followed by payment of the purchase-price balance of $6,800, to be financed by a mortgage. The first half of 1964 taxes was also paid by the Warricks at that time. Cleary testified that he carried fire insurance on the property because the Warricks did not, but he never demanded payment from them. Warrick testified he did carry fire and liability insurance, but did not say whether it covered Cleary's interest.

Warrick testified that when the contract was originally made with Cleary, Belfiore represented the latter and told him (Warrick) that the title question concerning Cleary's missing sister could be "cleared up in six month's time." The Warricks were not represented. Belfiore charged them $35 as one-half of the expense of drawing and recording the contract. Neither Cleary nor Belfiore denied the alleged representation as to feasibility of disposition of the title question. (Belfiore testified as to other matters.)[1] Cleary confirmed that Warrick knew of the title problem at the outset.

Warrick testified that at the time of and after the agreement with the Housing Authority he was continually after Cleary to clear up the title question, as the closing with the Authority was apparently being delayed solely because of the outstanding interest of Cleary's missing sister. Warrick said he was in a position to get short-term financing of his obliga-

---

[1] Belfiore should not have been trying the case and testifying in it as a witness. *Canons of Professional Ethics,* 19.

tion to Cleary pending the closing of the Housing Authority purchase if only the title question could be cleared. Cleary admitted that Warrick was calling him about this frequently and that he referred him to his attorney. He said: "He was just interested in getting the case cleared up and so was I." On redirect examination, Cleary testified he couldn't get the property title cleared at Warrick's request because "it didn't belong to me [Cleary]—the property," apparently referring to the outstanding interest of his missing sister.

Warrick testified that after the Housing Authority agreement he got Cleary's consent to his making up the installment arrears and consequently sent him $600, as noted above, and paid the first half 1964 taxes. Cleary denies this promise, but admits receiving and keeping the money as well as the additional $100 Warrick sent him for the July-August installment although his attorney had previously defaulted Warrick on the contract.

Warrick also testified that when the Housing Authority offer was first made to him he informed Cleary about it and asked whether the latter would wait for the principal balance due on the contract between them until it could be paid off out of the Housing Authority closing moneys, and Cleary acceded. Cleary seemingly denied this, but not very directly. He admitted on cross-examination that during the period Warrick was entreating him to get the title cleared up he regarded the latter as still having an interest in the property "if he got it paid" or "got it [the balance] cleared up."

Warrick vacated the premises August 15, 1964. The record does not indicate when the Housing Authority took possession.

The trial court regarded the issue before it as mainly one concerning the construction of the contract and whether it should be regarded as an equitable mortgage. It concluded that there was no equitable mortgage, relying on *Dorman v. Fisher*, 52 *N. J. Super.* 70 (*App. Div.* 1958), affirmed 31 *N. J.* 13 (1959). Further, it found no fraud; that the contract was unambiguous; and that the Warricks had defaulted

on the contract in respect of the monthly payments, in not procuring insurance naming the seller and in not tendering the principal balance due under the contract. Their claim to an interest in the fund in court was therefore denied.

The Warricks appeal, asserting an equitable right to be considered owners of the property, under all the circumstances, after having paid Cleary $4,200 in monthly payments and thus become entitled to obtain a mortgage for the $6,800 balance. They contend they are therefore entitled to such balance of the $12,000 paid into court as remains after deduction of the $6,800 due the Cleary interests and any unpaid taxes. Alternatively, they seek rescission for defect of title and restitution of the $4,200 paid in.

In *Dorman v. Fisher, supra,* the holdings of this court and of the Supreme Court were simply that an installment contract of the general character of the present one is not to be construed, *per se,* as the equivalent of an equitable mortgage with corresponding rights in the parties. It was stated by the Supreme Court, however: "We are not called upon to consider whether equitable relief in some form may be available where literal enforcement of a contract would be unconscionable." (31 *N. J.,* at *p.* 15).

We are convinced that under any reasonable view of the present proofs such literal enforcement of this contract as would deprive the Warricks of any interest in the fund in court would be unconscionable and should not be sanctioned by a court having equity powers.

It is here highly significant that on April 27, 1964, although the Warricks were in arrears several months in their monthly payments, and for taxes, Cleary joined with them in extending, as sellers, an option of purchase of the property to the Housing Authority for $12,000. It was Mr. Warrick, according to the uncontradicted evidence, who negotiated this arrangement with the Authority, having been successful in raising an original offer of the Authority from $10,200 to $12,000. The entry by Cleary into that offer with the Warricks as "seller" was a clear recognition and affirmation of

the continued subsistence of the status of the Warricks' equity in the property and contract of sale. The then existing state of default in the payments under the installment contract was obviously a recurrent condition which Cleary had acquiesced in from the beginning, he apparently having been satisfied until then to go along with the chronic late payments by the Warricks rather than take the property back. The Warricks had no reason in advance to suspect that once the Offer for Sale had been executed, with acceptance by the Authority obviously a practically assured eventuality, Cleary would suddenly spring the trap of forfeiture in order to obtain for himself the entirety of the $12,000 cash into which the property was about to be converted and refuse them the same opportunity he always previously had, to make good the arrearages, so as to enable them to save the substantial equity in the forthcoming $12,000 to which their installment contract would entitle them. This, in our view, is a plain situation of lulling others into a sense of security by misleading conduct and the consequent taking of unconscionable advantage, violative of elementary principles of fair dealing. *Cf. Baerenklau v. Peerless Realty Co.*, 80 *N. J. Eq.* 26, 34 (*Ch.* 1912)[2]; and see *Oliver v. Lawson*, 92 *N. J. Super.* 331, 335 (*App. Div.* 1966).

The foregoing conclusions are fortified by the apparent truth of Warrick's testimony that after the Housing Authority's offer materialized he began urging Cleary to get the long-standing title question cleared up so that the deal could be closed with the Authority and the parties be enabled to divide the $12,000 in accordance with their respective interests under their contract of sale. Cleary does not testify he responded to Warrick that this was no longer the latter's concern, as he had lost his interest by default. He admits Warrick was pursuing him on the matter and says, in effect,

---

2 "* * * I think it is very clear that this conduct on the part of the realty company amounted to a waiver of their right to claim a forfeiture without notice, without warning, so that the complainants could again be put upon their guard."

that he merely told Warrick the solution of the title problem was up to counsel. Here, again, is an implicit recognition of Warrick's interest, and further evidence of lulling, at least to the extent that these conversations may have preceded the notice of forfeiture on May 29, 1964. The trial court made no specific findings of fact on this facet of the case.

Cleary's greedy disposition in the matter is further manifested by his taking and keeping the $700 which Warrick sent him *after* the declaration of default in a vain effort to keep his equity alive, when he (Cleary) knew he was not intending to recognize that equity, obviously contemplated by Warrick as the condition for the acceptance of the money by Cleary.

We are also not in accord with the trial court's determination that the Warricks defaulted in not tendering the full balance of $6,800 when it became due at the end of May, 1964. In the first place, the default notice of May 29, 1964 was not predicated on failure to pay the balance of principal, but to make the periodic payments. Second, time was not made of the essence by the contract insofar as the balance of $6,800 was concerned (if at all). Indeed, the contract literally provided that the purchasers would be under the "duty * * * to obtain a mortgage of $6,800 for the unpaid balance." Clearly the purchaser would be entitled to a reasonable time for this purpose. Warrick's testimony, in effect, that he told Cleary that if the title were cleared he could get temporary financing of his obligation to him on the strength of the $12,000 contract with the Housing Authority is consonant with the attendant circumstances and not incredible, was not denied by Cleary, and was not negated by any specific fact finding of the trial court. These observations hold, whatever might be found, factually, as to the truth of Warrick's specific contentions: (a) that Cleary agreed to accept the $700 payments to render the Warricks current on the contract, and (b) that Cleary agreed to wait for the contract balance for disbursement out of the Housing Authority closing moneys, on the faith of which the Warricks

failed to avail themselves of other sources of capital for the purpose. No specific findings of fact on these issues were made by the trial court.

We hold that in the entirety of the attendant circumstances, especially the imminent transformation of the property into $12,000 cash through the Housing Authority purchase, it was grossly unconscionable for Cleary suddenly and without warning to forfeit the Warricks' interest in the property contrary to his continuous previous conduct in indulging lateness of payments. Had he not done so it is highly probable, if not certain, that he would have been made whole on his contract dues (subject to any delay or adjustment on account of the outstanding title interest) out of the Housing Authority sale proceeds, or directly from the Warricks on request therefor, and that the Warricks would have realized their rightful participation in the remainder of such proceeds.

The judgment is reversed and the cause remanded to the end that there be awarded to the Warricks such portion of the $12,000 fund in court as remains after deducting the $6,800 due the Cleary interests on the contract, any unpaid taxes or tax title claims, and legal interest on the $6,800 from July 29, 1964 (when the last $100 of the $4,200 was paid and accepted) to the date of taking of possession by the Housing Authority. Moreover, if inspection of the fire and liability policies procured by the Warricks shows they did not comply with the contract, there will further be deducted in favor of Cleary any sums paid out by him for such insurance, with legal interest to the date aforesaid.

So ordered.